UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FMS BONDS, INC. EMPLOYEES PENSION PLAN
DATED JUNE 30, 1980; FMS BONDS, INC.
EMPLOYEES PROFIT SHARING PLAN DATED JUNE
30, 1980; PAUL FEINSILVER and JAMES A. KLOTZ,
Joint Tenants; and FMS BONDS, INC. EMPLOYEE
401K PROFIT SHARING PLAN and TRUST FBO
TERRENCE O'GRADY,

                            Plaintiffs,

                -against-

BANK OF NEW YORK MELLON,

                            Defendant.

<u>OPINION AND ORDER</u>

15 Civ. 9375 (ER)

---

<u>Ramos, D.J.:</u>

        Plaintiffs are holders of a series of industrial revenue bonds issued to fund the

construction of a sewage disposal facility in Ohio.  They bring this suit for breach of contract and

breach of fiduciary duty against Bank of New York Mellon, the current indenture trustee

responsible for servicing the bonds ("the Trustee").  The claims arise out of the bankruptcies of

two entities that were allegedly obligated to make payments under the bonds, and the Trustee's

subsequent, alleged failures to protect the bondholders' interests.

        Before the Court are the Trustee's motion to dismiss the Complaint in its entirety

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 22), and Plaintiffs'

cross-motion for summary judgment as to their first claim only, pursuant to Rule 56 (Doc. 37).

For the following reasons, the Trustee's motion is GRANTED in part and DENIED in part, and

Plaintiffs' motion is DENIED with leave to renew at a later date.

# I. BACKGROUND

## A. Factual Background[1]

### The Bonds, the Loan Agreement, and the Indenture

Around 1994, the former General Motors Corporation ("GM") sought to build a sewage disposal facility in Warren, Ohio, and negotiated with the County of Trumbull, Ohio (the "Issuer") regarding the issuance of a series of industrial revenue bonds (the "Bonds") in order to finance the project. On July 1, 1994, the Issuer and GM entered into a written agreement pursuant to which the Issuer would loan GM proceeds to fund the construction project (the "Loan Agreement"). *See* Declaration of Paul T. Weinstein ("Weinstein Decl.") (Doc. 28), Ex. B ("Loan Agreement"). The proceeds loaned under the Loan Agreement were generated by the offering and sale of the Bonds in the aggregate principal amount of $2.75 million. The Bonds were issued pursuant to a written Indenture of Trust (the "Indenture"), also dated July 1, 2004, as executed between the Issuer and an Indenture Trustee (the "Trustee"), Dai-Ichi Kango Trust Company of New York ("DKT"). *See* Weinstein Decl., Ex. C ("Indenture"). In 1999, DKT was succeeded as Trustee by JPMorgan Chase Bank ("JPMC"). Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def. Br.") (Doc. 27) at 2 n.4. Seven years later, on October 1, 2006, the predecessor to Defendant BNY Mellon would succeed JPMC as Trustee. *Id.*; *see also* Affidavit of Gary Bush ("Bush Aff.") (Doc. 45), ¶ 3.

---

[1] This Opinion resolves both the Trustee's motion to dismiss pursuant to Rule 12(b)(6) and Plaintiffs' cross-motion for summary judgment pursuant to Rule 56. Consequently, the facts of the case are taken both from the Complaint and from evidence submitted by the parties into the record. Plaintiffs consent to the Court's consideration of all of the extrinsic documents attached to the Declaration of Paul T. Weinstein (Doc. 28). *See* Memorandum of Law of Plaintiffs in Opposition to Motion to Dismiss (Doc. 38) at 2. Likewise, the Trustee has not challenged the authenticity of, or otherwise objected to, the Court's consideration of the public court documents or notices sent to bondholders by the Trustee, which are attached to the Declaration of J. Joseph Bainton (Doc. 39), Exs. A–D. *See, e.g.*, *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011) (listing categories of extrinsic evidence courts may consider on a motion to dismiss).

Plaintiffs are bondholders owning 92.73% of the Bonds issued, which they acquired in October 2009.  *See* Complaint ("Compl.") (Doc. 1) ¶¶ 7–12.   They allege that the Loan Agreement and the Indenture "contain frequent reference to the other and were intended to be read together," and that, together, those two agreements "required GM to repay with periodic interest the $2,750,000 aggregate amount of the Bonds to the Trustee" on behalf of the Issuer and, ultimately, the bondholders.  *Id.* ¶¶ 17, 19.

The following provisions of the Indenture and Loan Agreement, summarized and reproduced in part immediately below, are most relevant to this action:

- The Loan Agreement memorializes the agreement between the Issuer and GM, pursuant to which the Issuer agreed to loan GM all of the proceeds raised by the issuance of the Bonds, while GM agreed to pay back the principal and interest due under the Loan Agreement, which would in turn serve as the cash flow paying off the debt service on the Bonds.  *See* Loan Agreement §§ 4.1, 4.2.

- Assignment of the Loan Agreement requires consent of the Issuer, GM, *and* the Trustee in order to be effective.  *See* Loan Agreement § 8.2

- The Indenture defines an "Event of Default" in part to include (i) a failure to pay the principal, premium, or interest on any Bond at the time it becomes due, and (ii) any occurrence defined as an "Event of Default" under the Loan Agreement.  Indenture § 8.1(a), (b), (d).  The Loan Agreement, in turn, defines an "Event of Default" to include GM's filing of a voluntary petition in bankruptcy.  Loan Agreement § 6.1(c).

- Article 8 of the Indenture, entitled "Default Provisions and Remedies of Trustee and Bondholders," provides in part as follows:

  - *Acceleration, § 8.2*:  If an Event of Default occurs under Indenture § 8.1(d) and Loan Agreement § 6.1(c), *i.e.*, GM's filing for bankruptcy, "the principal of and accrued interest on all Bonds then outstanding shall be and become immediately due and payable."

  - *Remedies and Bondholder Rights, § 8.3*:  Upon an Event of Default, the Trustee "may, in addition or as an alternative, pursue any available remedy by suit at law or in equity" to enforce payment of outstanding principal, premium, and interest on the Bonds.  Furthermore, the Trustee "shall be obligated" to pursue such remedies upon (i) an Event of Default, (ii) a request to do so by the owners of a majority in aggregate principal amount of Bonds then outstanding, *and* (iii) "being indemnified as provided in Section 9.1(*l*) hereof."

3

- o *Right of Bondholders To Direct Proceedings, § 8.4*:  Subjection to Indenture § 9.1(*l*), the "owners of a majority in aggregate principal amount of the Bonds then outstanding shall have the right, at any time…, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement…of this Indenture…."

- o *Notice to Bondholders of Defaults and Acceleration, § 8.13*:  Upon automatic acceleration following GM's filing for bankruptcy, "the Trustee shall promptly give written notice thereof by first-class mail to the Issuer and to the owner of each Bond."

- Section 9.1 of the Indenture, entitled "Acceptance of Trusts," provides in part as follows:

  - o "The Trustee, prior to the occurrence of an event of default and after the curing of all events of default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  In case an event of default has occurred (which has not been cured or waived) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  § 9.1(a).

  - o "The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty and it shall not be answerable for other than its negligence or willful default."  § 9.1(g).

  - o "Before taking any action referred to in Section 8.3, 8.4, 8.9 or 9.4 hereof the Trustee may require that a satisfactory indemnity bond be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability, except liability which is adjudicated to have resulted from its failure to comply with the standard of care prescribed by Section 9.1(a) hereof by reason of any action so taken." § 9.1(*l*).

  - o "None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur financial liability in the performance of any of its duties or the exercise of any of its rights or powers hereunder, except as expressly provided herein.  The Trustee shall not be required to give any bond or surety in respect to the execution of its rights and obligations hereunder."  § 9.1(o).

- The Indenture "shall be governed and construed in accordance with" Ohio law.  *See* Indenture, § 12.9.

**The 1999 Agreement**

On January 1, 1999, GM and Delphi Automotive Systems LLC ("Delphi") entered into a written agreement (the "1999 Agreement") under which Delphi assumed GM's obligations to make payments under the Bonds to the Trustee.  *See* Weinstein Decl., Ex. D ("1999 Agreement").[2]  The 1999 Agreement purported to assign the Loan Agreement in full to Delphi, but the Trustee was not a party to the 1999 Agreement, and Plaintiffs allege that the Trustee never consented to such an assignment, and that neither GM nor Delphi sought to comply with the provision of the Loan Agreement requiring the Trustee to consent to any assignment.  *See* Compl. ¶¶ 22–25; Loan Agreement § 8.2.  Plaintiffs also note that no amendment was made to the Loan Agreement or the Indenture as a result of the 1999 Agreement.  Compl. ¶ 26.  Nevertheless, Plaintiffs allege that, upon learning of the 1999 Agreement, the Trustee should have known that it was an "intended third-party beneficiary" of the 1999 Agreement.  *Id.* ¶ 27.  Critically, upon execution of the 1999 Agreement, Delphi honored its payment obligations to the Trustee for at least the next ten years.

**The Delphi Bankruptcy**

Delphi filed a petition for relief under Chapter 11 of the Bankruptcy Code in 2005 (the "Delphi Bankruptcy").  Compl. ¶ 28.  The bar date for creditors to file a proof of claim in the Delphi Bankruptcy was July 31, 2006 (the "Delphi Bar Date").  *See* Weinstein Decl., Ex. I at ¶ 2.

In August 2008, Delphi entered into a Master Restructuring Agreement with GM (the "Delphi-GM MRA"), pursuant to which Delphi "agreed to perform certain of its existing contractual obligations to GM, including paying GM's obligations to the Trustee in respect of the

---

[2] Plaintiffs allege on information and belief that Delphi agreed to assume such obligations in exchange for receiving 100% of the use and benefit of the sewage facility project.  Compl. ¶ 22.

Bonds."  Compl. ¶ 29.  The Delphi-GM MRA contained an express "no third-party beneficiary"

provision, however, and in any event, Delphi and GM entered into a subsequent agreement

pursuant to which Delphi's obligations to GM were resolved and extinguished.  *See* Declaration

of J. Joseph Bainton (Doc. 39) ("Bainton Decl."), Ex. C at 55–56.

The Delphi Bankruptcy concluded in August 2009.  The Trustee did not file a proof of

claim in the bankruptcy case, timely or otherwise.  Compl. ¶ 32.  The agreement memorializing

the conclusion of the Delphi Bankruptcy "contained no provision that created, provided for or

referred to any direct obligation of Delphi to the Trustee, the issuer or the Bond Holders with

respect to the Bonds."  *Id.* ¶ 34.  Delphi continued, however, to make all payments to the Trustee

due under the Bonds throughout the entire course of the Delphi Bankruptcy.  *Id.* ¶ 31.

As previously noted, while the Delphi Bankruptcy was in process, the Bank of New

York, predecessor to Defendant BNY Mellon, succeeded JPMC as the Trustee in 2006.  BNY

Mellon has remained the Trustee from 2006 to the present date.  Bush Aff., ¶ 3.

**The GM Bankruptcy**

GM filed a petition for relief under Chapter 11 of the Bankruptcy Code in June 2009 (the

"GM Bankruptcy").  Compl. ¶ 35.  The bar date for creditors to file a proof of claim in the GM

Bankruptcy was November 30, 2009 (the "GM Bar Date").  *See* Weinstein Decl., Ex. J at 2.

As previously noted, the GM Bankruptcy constituted an "Event of Default" under the

Indenture and Loan Agreement, which required the Trustee to use the same degree of care and

skill in the exercise of its judgment as a prudent person would exercise.  Loan Agreement §

6.1(c); Indenture §§ 8.1(d), 9.1(a).  Plaintiffs allege that, although a prudent person would have

timely filed a proof of claim in the GM Bankruptcy with respect to the Bonds, and although the

Trustee separately filed over one hundred other proofs of claim in the GM Bankruptcy in both its

6

individual and representative capacities, the Trustee did not file a proof of claim with respect to the Bonds, and GM's obligations to the Trustee under the Bonds were not scheduled as GM obligations in GM's bankruptcy filings.  Compl. ¶¶ 38, 41–43.  The Trustee does not dispute that the Bonds were not listed as an obligation of GM in the bankruptcy filings.  But the Trustee contends that the Bonds were not listed because, by that point, they were a direct obligation of Delphi's—indeed, as the Trustee notes, Delphi made an interest payment to the Trustee on July 1, 2009, a payment that, had GM attempted to make it, would have been precluded by the automatic stay then in place due to the GM Bankruptcy.  *See* Bush Aff. ¶ 4.

On July 8, 2009, the Bankruptcy Court approved an Asset Sale Plan (the "New GM Plan"), which in essence conveyed "virtually all" of the remaining assets of the debtor to a new entity called "General Motors Company," which later changed its name to "Motor Liquidation Company" ("New GM").  *Id.* ¶¶ 44–45.  Neither the New GM Plan nor any other order from the Bankruptcy Court required the new GM to assume any obligation as to the Trustee in respect of the Bonds.  *Id.* ¶ 46.  As Plaintiffs allege, "as a result of the closing of the GM bankruptcy case, GM's obligations in respect of the Bonds [were] discharged and the Bonds thereby rendered worthless."  *Id.* ¶ 47.

### Plaintiffs' Acquisition and Due Diligence

Plaintiffs acquired the Bonds at issue on October 29, 2009.  *Id.* ¶ 9.  Two days prior to that, one of Plaintiffs' credit analysts, Jay H. Abrams, Ph.D, contacted both GM and the Trustee via email, in an effort to determine which entity was obligated to pay the Bonds (the "Abrams-BNY Email").  *See* Weinstein Decl., Ex. K at Ex. A at p.1 ("Abrams-BNY Email").  GM informed Dr. Abrams that the Bonds were "the responsibility of Delphi."  *Id.*  On October 29, 2009, Delphi's Treasury Director, Albert VanDenBergh, wrote Dr. Abrams that the Bonds "were

an allowed secured claim in Delphi's bankruptcy and as of emergence have been assigned to 'New' Delphi," entitling bondholders to "equal installments of cash payments over seven years from the date of emergence" plus interest (the "Abrams-Delphi Email").  *See* Weinstein Decl., Ex. K at Ex. A at p.2 ("Abrams-Delphi Email").

**<u>Delphi's Disavowal, the Notice of Default, and the January 2011 Notice</u>**

Despite the assurance in the Abrams-Delphi Email, on January 2, 2010, Delphi failed to make an interest payment due on the Bonds.  After inquiry from the Trustee, Mr. VanDenBergh informed the Trustee that Delphi would not make the interest payment because Delphi was obligated "only to the extent that General Motors Corporation is obligated to make such payments," and since the GM Bankruptcy discharged all obligations GM owed to the Trustee, Delphi no longer had to pay on an underlying GM obligation that no longer existed.  Weinstein Decl., Ex. K at Ex. B; *see also* Compl. ¶ 48.

On February 16, 2010, the Trustee sent the bondholders, including Plaintiffs, a "Notice of Event of Default" (the "Notice of Default").  *See* Bainton Decl., Ex. A ("Notice of Default"). The Notice of Default notified bondholders that (1) an "Event of Default," as defined under Section 8.1(a) of the Indenture, had occurred based on Delphi's failure to make the January 2 interest payment, and (2) pursuant to Section 8.13 of the Indenture, "an automatic acceleration of the principal and interest of the Bonds has previously occurred due to the filing of a Chapter 11 Petition in the United States Bankruptcy Court…by General Motors."  *Id*. at 1.

On March 16, 2010, the Trustee sought further clarification and documentary support from Delphi for its position that Delphi no longer had an obligation to pay on the Bonds.  *See* Weinstein Decl., Ex. K at Ex. C.  After receiving a copy of the 1999 Agreement from GM, the Trustee again wrote to Delphi on August 20, 2010, formally taking the position that Delphi, upon

execution of the 1999 Agreement, assumed a direct obligation to pay the Bonds and had to "immediately cure the existing defaults under the Loan Agreement and affirm its obligation to make all future payments."  *Id.*, Ex. K at Ex. D.

On November 15, 2010, Delphi moved the Bankruptcy Court that adjudicated the Delphi Bankruptcy to enjoin the Trustee from taking any action against Delphi regarding payment on the Bonds.  *See* Compl. ¶ 50.  On December 10, 2010, the Bankruptcy Court ruled in Delphi's favor and enjoined the Trustee from seeking payment from Delphi without prior authorization of the Bankruptcy Court (the "December 2010 Order").  *See id.* ¶ 51; Weinstein Decl., Ex. F ("December 2010 Order"); Bush Aff. ¶ 16.

Subsequently, on January 7, 2011, the Trustee issued a notice to all bondholders, including Plaintiffs, seeking direction on how to proceed (the "January 2011 Notice").  *See* Bainton Decl., Ex. B ("January 2011 Notice"); Bush Aff. ¶ 17.  The January 2011 Notice notified bondholders of (i) the 1999 Agreement, under which (as the Trustee put it) Delphi "assumed certain obligations" from GM, including the Loan Agreement and the interest payments on the Bonds, and (ii) the Delphi Bankruptcy.  January 2011 Notice at 1.  The January 2011 Notice further stated that, as a result of Delphi's original petition, "certain motions filed in the bankruptcy by Delphi," and Delphi's "reorganization plan," Delphi was maintaining that it was no longer responsible for payments due on the Bonds.  *Id.* at 1.  The January 2011 Notice also notified bondholders of the December 2010 Order, and of Delphi's failure to make interest payments due in July 2010 and January 2011.  *Id.* at 1–2.  Like the Notice of Default before it, the January 2011 Notice reminded bondholders of their right under the Indenture to direct the Trustee to initiate legal proceedings and the Trustee's corresponding right to request

indemnification for any costs, expenses, or liabilities associated with such a direction.  *See*

January 2011 Notice at 2; Notice of Default at 1–2.

**The D&I Agreement**

Pursuant to section 8.4 of the Indenture, Plaintiffs executed a Direction & Indemnity

Agreement (the "D&I Agreement") on November 17, 2011.  *See* Weinstein Decl., Ex. E

("D&I").  The D&I Agreement instructed the Trustee to seek an order from the Delphi

Bankruptcy Court authorizing the Trustee to commence an action against Delphi seeking the

outstanding principal and interest due under the Bonds, or in the alternative, if such relief was

denied, to file late proofs of claim in the Delphi Bankruptcy (the "Instruction").  *Id.* at 1.

Further, pursuant to sections 9.1(*l*) and (o) of the Indenture, Plaintiffs agreed to indemnify the

Trustee "on demand" for any losses, liabilities, costs, and expenses related to the Trustee's

compliance with the Instruction.  *See id.* at 1–2.[3]  The indemnity provision specifically covered

---

[3] The D&I Agreement's indemnification provision, D&I at 1–2, is reproduced in full here:

Pursuant to Sections 9.1(*l*) and (o) of the Indenture, with respect to actions taken in accordance with and pursuant to the Instruction, the undersigned Instructing Parties each hereby agree to, and shall, pay and reimburse and be liable to the Trustee and each director, officer and employee of the Trustee, its successors and affiliates (the Trustee and each such other person being an "Indemnified Person") on demand for, and to indemnify and hold harmless each such Indemnified Person from and against, without limitation, any and all losses, liabilities, judgments, claims, causes of actions, costs and expenses (including, but not limited to, fees and disbursements of legal counsel as designated below and Trustee Extraordinary Time Charges, defined below) (collectively referred to herein as "Losses") incurred or suffered by an Indemnified Person in any way, directly or indirectly, arising out of, related to, or connected with the compliance by the Trustee or any other Indemnified Person with the Instruction or the taking or not taking of action (in either case solely as directed by the Instructing Parties) in accordance with said Instruction, including, without limitation, (i) any claim, cause of action, litigation, proceeding, action or investigation (whether civil, criminal or administrative and whether sounding in tort, contract or otherwise and whether such Indemnified Person is a party to such litigation, proceeding or investigation) in any way directly or indirectly, arising out of, related to, or connected with, the taking, by the Trustee or any other Indemnified Person, of action in accordance with the Instruction and (ii) Losses resulting from, arising out of or in any manner connected with, directly or indirectly, (a) a determination that the Trustee or any other Indemnified Person breached its or their fiduciary duty under the Indenture as a result of relying upon and complying with the Instruction and (b) the enforcement of this letter agreement, provided, however, that the foregoing indemnity (the "Indemnity") shall not be applicable to any Losses suffered or incurred by an Indemnified Person as a result of an Indemnified Person's gross negligence or willful misconduct as determined by a judgment of a court that is binding on such Indemnified Person, is final and is not subject to review on appeal.

breaches of fiduciary duty "as a result of relying upon and complying with the Instruction," but did not cover losses resulting from the Trustee's "gross negligence or willful misconduct." *Id.*

### The Joint Motion, the February 2012 Order, and the Joint Stipulation

Pursuant to the D&I Agreement, Plaintiffs and the Trustee jointly filed a motion in the Delphi Bankruptcy on December 12, 2011, seeking permission to proceed against Delphi for payment of the Bonds (the "Joint Motion"). *See* Weinstein Decl., Exs. K, L. In that motion, Plaintiffs and the Trustee took the position that payment on the Bonds was Delphi's obligation, not GM's, because the 1999 Agreement was an executory contract assumed by Delphi under the Bankruptcy Code, which was "clear and unambiguous" in assigning to Delphi all of GM's rights, obligations, and benefits under the Loan Agreement. *See* Weinstein Decl., Ex. L at 7–10. The Joint Motion further stated that relief was appropriate because Delphi continued to make payments on the Bonds after the Delphi Bar Date had passed, and even affirmatively represented to Plaintiffs, four years later, that "the Bonds were approved secured claims, and that payment would continue to be made on them." *Id.* at 12. Accordingly, the Joint Motion concluded, Plaintiffs "had no reason to speculate or surmise that [Delphi] would suddenly stop paying on an obligation that all parties clearly recognized as an obligation of [Delphi]." *Id.*

The Bankruptcy Court denied the Joint Motion on February 27, 2012 (the "February 2012 Order"), concluding that the Trustee and Plaintiffs failed to show cause for relief from the injunction prohibiting further claims against Delphi. Weinstein Decl., Ex. G ("February 2012 Order"). The Bankruptcy Court found that any obligation that Delphi owed the Trustee arose pre-bankruptcy-petition under the 1999 Agreement, and as a result, the Trustees right to payment was "subject to the Bar Date order and discharge" that concluded the Delphi Bankruptcy. *Id.* ¶ G. The Bankruptcy Court further found that "[n]o proof of claim was timely filed against

[Delphi] in respect of claims arising under the 1999 Agreement," and that GM "released its rights to enforce the 1999 Agreement that it had previously been granted by [Delphi] (under an agreement containing an express "no third party beneficiary" clause) during the chapter 11 case." *Id.* ¶ H.  In other words, the Bankruptcy Court concluded that the only possible obligation running from Delphi to the Trustee would be based off the Trustee's status as third-party beneficiary of the 1999 Agreement—but the conclusion of the Delphi Bankruptcy extinguished all obligations that Delphi had under the 1999 Agreement, whether running to the Trustee, GM, or any other entity.  *See* Bainton Decl., Ex. C at 48–53; *id.* at 56–57 ("So the only basis for the indenture trustee's claim is once more the 1999 agreement, which the debtor only assumed as between itself and GM, and then with GM agreed would no longer be in effect as between them….So to the extent that the indenture trustee has a right under…the 1999 agreement, the rights under it are pre-petition claims that are clearly governed by the bar date order and the discharge.").

The Trustee appealed the February 2012 Order on March 12, 2012.  On March 20, 2012, however, Delphi, the Trustee, and Plaintiffs entered into a "Joint Stipulation and Agreed Order" that resolved the appeal (the "Joint Stipulation").  *See* Bainton Decl., Ex. D ("Joint Stipulation"). The Joint Stipulation (i) dismissed the appeal, and (ii) granted the Trustee a general, unsecured non-priority claim in the full principal amount of $2,750,000 against Delphi.  *Id.* ¶¶ 1–2.  The Joint Stipulation also included a release provision deeming the allowance of the unsecured non-priority claim to serve as full satisfaction of all claims that Plaintiffs and the Trustee may have had relating to the Bonds, Loan Agreement, Indenture, 1999 Agreement, and Delphi-GM MRA. *Id.* ¶ 3.  That provision further states, however, that "nothing contained herein shall be deemed to satisfy or release any claims or defenses of any Movant against any other Movant, including the

Indenture Trustee whatsoever"—where "Movant" is defined as the Plaintiffs and the Trustee in this case. *Id.* The provision, in other words, expressly carves out from the general release any claims that Plaintiffs may have against the Trustee.

### The May 2013 Letter

By letter dated May 30, 2013, the Trustee wrote Plaintiffs regarding the potential for seeking court authority to file a late proof of claim in the GM Bankruptcy (the "May 2013 Letter"). *See* Weinstein Decl., Ex. H ("May 2013 Letter"). The letter reported that GM's counsel would oppose such action because GM was taking the position that the Bonds were "not an obligation of GM." *Id.* at 1. In light of GM's position and Delphi's payments on the Bonds during the Delphi Bankruptcy, the Trustee concluded that it "may be difficult to obtain a similar unsecured claim in the GM bankruptcy estate," and thus requested "further indemnification protection" from Plaintiffs before proceeding with the filing of a motion in the GM Bankruptcy. *Id.*; *see also* Bush Aff. ¶ 24 (explaining that the Trustee requested further indemnification before proceeding against GM both because of GM's objection and because Plaintiffs previously directed the Trustee to take a contrary position in the Delphi Bankruptcy).

Plaintiffs did not provide any further indemnification protection, nor did they ever direct the Trustee to file a late proof of claim in the GM Bankruptcy.

### B. Procedural Background

Plaintiffs filed the instant suit on November 30, 2015. (Doc. 1). The Complaint originally alleged four causes of action: (1) breach of contract (the Indenture) for failure to file a timely proof of claim in the GM Bankruptcy, (2) breach of contract (the Indenture) for failure to file a timely proof of claim in the Delphi Bankruptcy, (3) violation of New York General Business Law ("NY GBL") § 349, and (4) breach of fiduciary duty for seeking further

indemnification in order to rectify the Trustee's own mistakes and negligence.  *See* Compl. ¶¶ 69–89.  The Complaint also seeks an award of punitive damages on the first, second, and fourth claims.  *Id.* ¶¶ 90–94.

The Trustee moved to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) on February 26, 2016.  (Doc. 22).  Plaintiffs voluntarily dismissed their third claim for relief under NY GBL § 349 on March 21, 2016.  (Doc. 29).  Plaintiffs then cross-moved for summary judgment as to liability on their first claim for relief on March 26, 2016.  (Doc. 37).

## II. LEGAL STANDARDS

### A.  Rule 12(b)(6) Motion To Dismiss

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must take the allegations of the complaint to be true and "draw all reasonable inferences in favor of the plaintiff."  *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  A plaintiff must make sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).

### B.  Rule 56 Summary Judgment

To prevail on summary judgment, the movant must show that the admissible evidence and pleadings leave "no genuine dispute as to any material fact."  Rule 56(a).  "An issue of fact

is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'"  *Id.*  "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322–23).  In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citing *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

## III. DISCUSSION

### A.  First Claim:  Breach of Contract for Failure To File Timely in GM Bankruptcy

Plaintiffs' first claim alleges a breach of the Indenture due to the Trustee's failure to file a timely proof of claim in the GM Bankruptcy.[4]  According to Plaintiffs, following the Event of

---

[4] In their briefing, Plaintiffs effectively try to expand their first claim for relief to include (i) the Trustee's failure to provide the required notice to bondholders of the GM Bankruptcy, and (ii) the insufficiency of the Notice of Default and January 2011 Notice in detailing the timing and consequences for bondholders of the 1999 Agreement, Delphi's commencement and later termination of payments due, the GM and Delphi Bankruptcies, and the Trustee's efforts to obtain the accelerated payments due.  *See, e.g.*, Memorandum of Law of Plaintiffs in Opposition to Motion to Dismiss (Doc. 38) at 5–8, 14–16.  Some of these claims may be time-barred, but more importantly, none of them are specifically alleged as grounds for relief in the Complaint.  Plaintiffs cannot amend their Complaint via briefing.

Default triggered by the filing of the GM Bankruptcy, a prudent indenture trustee would have filed a timely proof of claim under the circumstances—namely, that GM was still directly obligated to pay under the Loan Agreement, and the Trustee never consented to an assignment of that direct obligation to any other entity.

Following the Trustee's motion to dismiss the Complaint in its entirety, Plaintiffs cross-moved for summary judgment on its first claim as to liability only.  The Court denies both motions as to the first claim.  While Plaintiffs' have pleaded a plausible basis for relief, on this record there remain genuine factual issues as to the prudence of the Trustee's conduct.

In seeking dismissal on the pleadings, the Trustee initially argues that the D&I Agreement's indemnification provision[5] bars Plaintiffs' first claim for relief.  *See* Def. Br. at 13–14; Reply Memorandum of Law in Further Support of Motion to Dismiss ("Def. Rep.") (Doc. 43) at 12–15.  The Court disagrees.  There is nothing in the D&I Agreement to suggest that Plaintiffs agreed to indemnify the Trustee for losses caused by the Trustee's inaction nearly two years prior to the execution of the agreement and the issuance of Instruction therein.  By its express terms, the D&I Agreement only covers losses contemplated in *enforcement* of the Instruction.  *See* D&I at 1 (agreeing to indemnity "with respect to actions taken in accordance with and pursuant to the Instruction"); *id.* at 1–2 (covering losses incurred "in any way, directly or indirectly, arising out of, related to, or connected with *the compliance by the Trustee or any other Indemnified Person with the Instruction* or the taking or not taking of action (in either case *solely as directed* by the Instructing Parties) *in accordance with said Instruction*) (emphasis

---

*See, e.g.*, *A Star Grp., Inc. v. Manitoba Hydro*, 621 F. App'x 681, 683 (2d Cir. 2015) ("[A] party may not amend its pleadings through statements in its briefs.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011) ("'[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.'") (quoting *Kosovich v. Metro Homes, LLC*, No. 09 Civ. 6992 (JSR), 2009 WL 5171737, at *5 n.6 (S.D.N.Y. Dec. 29, 2009)).

[5] *See supra* n.3.

added); *id.* at 2 (applying to legal actions directly or indirectly "arising out of, related to, or connected with, *the taking, by the Trustee or any other Indemnified person, of action in accordance with the Instruction*") (emphasis added); *id.* (applying to losses both from a determination that Trustee breached its fiduciary duties "as a result of relying upon and complying with the Instruction" and from "the enforcement" of the D&I Agreement); *see also* Def. Br. at 13 (describing D&I Agreement as relating only to action or inaction "taken by the Trustee *pursuant to the Direction*") (emphasis added).  The conduct that Plaintiffs allege was in breach of the Indenture's prudence standard—the failure to file a proof of claim in the GM Bankruptcy before the GM Bar Date—was plainly not arising out of, related to, or in compliance with an instruction issued nearly two years later.  Simply asserting that the prior failure to file timely is "directly related" to the D&I Agreement, as the Trustee does, Def. Br. at 14, does not justify interpreting the D&I Agreement to bar suits brought by the indemnitor for pre-instruction breaches of the contractual duty of prudence.  *See Akhenaten v. Najee, LLC*, No. 07 Civ. 970 (RJH), 2010 WL 305309, at *2 (S.D.N.Y. Jan. 26, 2010) ("An indemnity agreement 'cannot be held to have a retroactive effect unless by its express words or necessary implication it clearly appears to be the parties' intention to include past obligations.'") (quoting *Quality King Distribs., Inc. v. E & M ESR, Inc.*, 36 A.D.3d 780, 782 (N.Y. App. Div. 2007)); *see also Eckhoff v. Wal-Mart Assocs., Inc.*, No. 13 Civ. 2395 (CS), 2013 WL 6847117, at *3 (S.D.N.Y. Dec. 30, 2013) ("Under New York law, 'indemnity provisions will not be construed to indemnify a party against his own negligence unless such intention is expressed in unequivocal terms.'") (quoting *Margolin v. N.Y. Life Ins. Co.*, 297 N.E.2d 80, 82 (N.Y. 1973)); *Williams v. J.P. Morgan & Co.*, 248 F. Supp. 2d 320, 325–26 (S.D.N.Y. 2003) (collecting cases for proposition that

indemnification contract purporting to insulate party from its own negligence requires unequivocal language).[6]

The Trustee next argues that it necessarily acted prudently in not filing a timely proof of claim in the GM Bankruptcy because Plaintiffs, both in the D&I Agreement and in the Joint Motion, took the position that Delphi was the direct obligor. *See* Def. Rep. at 2–3, 19–20. This is essentially a judicial estoppel argument, in that the Trustee seeks to bind Plaintiffs to their previous representations that it was Delphi's obligation to pay under the Bonds. *See* Def. Br. at 12; Def. Rep. at 12 n.4. "[I]n evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)). "[B]ecause judicial estoppel is designed 'to prevent improper use of judicial machinery,' it is 'an equitable doctrine invoked by a court at its discretion.'" *Id.* (quoting *New Hampshire*, 532 U.S. at 749–50). Moreover, in this Circuit, judicial estoppel is generally limited "to situations where the risk of inconsistent results with its

---

[6] The terms of the D&I Agreement are governed by substantive New York law. *See* D&I at 4. The parties discuss at some length whether the indemnification provision in the D&I Agreement applies exclusively to third-party claims or if first-party claims are included as well. *See* Pl. Br. at 11–12; Def. Rep. at 13–15. The Court need not resolve this question broadly—it is sufficient to say that the indemnification provision does not bar *this* particular first-party claim, asserting a pre-instruction breach of the contractual duty of prudence. Additionally, the parties also take opposing positions on what the Joint Stipulation reveals about the applicability of the D&I Agreement's indemnification provision to this action. *See, e.g.*, Def. Rep. at 15–16. But these arguments are pretty much a wash: As Plaintiffs point out, if the D&I Agreement stretched as broadly as the Trustee argues, the parties engaged in wasted effort in negotiating and agreeing to the provision stating that the Joint Stipulation could not be "deemed to satisfy and release any claims or defenses" that could be asserted as between Plaintiffs and the Trustee. *See* Pl. Br. at 9–10. On the other hand, as the Trustee argues, the Joint Stipulation expressly preserves all "defenses" that the Trustee might have against Plaintiffs, including presumably a defense based on the supposed preclusive effect of the D&I Agreement. *See* Def. Rep. at 15–16.

impact on judicial integrity is certain." *Id.* (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)) (internal quotation marks omitted).

As Plaintiffs persuasively argue, judicial estoppel is not appropriate here for two reasons. First, Plaintiffs plainly did not persuade any court to accept its earlier position— the Bankruptcy Court denied the Joint Motion, and the upshot of the February 2012 Order was that GM was the only possible remaining direct obligor of the Bonds.[7]  Second, Plaintiffs' current position that GM has always remained obligated to the Trustee under the Loan Agreement is not "clearly inconsistent" with the position that Delphi *also* was obligated to pay the Trustee as a third-party beneficiary of the 1999 Agreement.  Plaintiffs are therefore not bound to the arguments they made in the Joint Motion before the Delphi Bankruptcy Court (though, as Plaintiffs appear to acknowledge, these prior representations might be admissible evidence relevant to the prudence of the Trustee's conduct).

To the extent the Trustee did not intend a judicial estoppel argument, it appears to be arguing that its conduct was *per se* prudent *because* Plaintiffs instructed the Trustee to take the position that Delphi was obligated to make bond payments.  *See* Def. Br. at 13–15; Def. Rep. at 12, 19.  But the Trustee does not cite to any authority in support of this position, and the Trustee's prudence from June to November 2009 cannot be conclusively determined one way or another by Plaintiffs' instruction and litigation position taken two years later.  *See LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 (MBM), 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997) (holding that New York's prudent person standard requires that indenture trustee "be judged by the facts as they existed at the time the trustee acted").

---

[7] While the Trustee did procure the Joint Stipulation eventually, that agreement did not involve persuading a *court* of the validity of Plaintiffs' position.

Finally, in opposing Plaintiffs' summary judgment motion, the Trustee argues that the following "questions of fact" exist: (i) whether GM was actually obligated to make payments under the Bonds during the course of the GM Bankruptcy, (ii) whether the Trustee actually had notice of an Event of Default upon GM's filing for bankruptcy, given that Delphi was making payments during the GM bankruptcy, and (iii) whether the Trustee acted prudently, or whether it was required to file a proof of claim in the GM Bankruptcy without an express instruction from the bondholders to do so, where Delphi was making payments during that bankruptcy despite the automatic stay, and GM had at all times denied any obligation to make payments. *See* Def. Rep. at 19–21.

The first purported issue is not actually disputed. Based both on the plain language of the Loan Agreement and the 1999 Agreement, and on the arguably issue-preclusive findings of the Delphi Bankruptcy Court in the February 2012 Order, there is no evidence that GM's obligation running to the Trustee was ever altered, assigned, or otherwise terminated prior to the conclusion of the GM Bankruptcy. At the time of that bankruptcy, the Trustee knew or should have known both that it never consented to assignment, as was required by section 8.2 of the Loan Agreement, and that it was never in privity with Delphi and thus could only be, at best, a third-party beneficiary of the 1999 Agreement. The Court is thus able to conclude that, prior to the conclusion of its bankruptcy, GM remained obligated to make payments to the Trustee under the Loan Agreement (whether or not Delphi had agreed to undertake the obligation during that time).

Next, regardless of Delphi's continuing payments, it seems likely that the Trustee had notice of the GM Bankruptcy, especially since the Trustee allegedly filed other proofs of claim in that very bankruptcy case. The Indenture and Loan Agreement are clear that GM's filing for bankruptcy constituted an Event of Default for which the Trustee was *required* to give notice and

20

accelerate payments of the outstanding principal and interest due.  *See* Indenture §§ 8.1(d), 8.2, 8.13; Loan Agreement § 6.1(c).  Nothing in these agreements provides an exception where another entity was making payments under the Bonds, so the fact that Delphi was making such payments is irrelevant to whether the Trustee had notice of the Event of Default triggered by the GM Bankruptcy.  Rather, as Plaintiffs point out, the Trustee effectively conceded that it had notice of the GM Bankruptcy when arguing the Joint Motion before the Delphi Bankruptcy Court.  *See* Bainton Decl., Ex. C at 26 (justifying Trustee's failure to file in GM Bankruptcy by referencing Delphi's continuing payments and GM's denial of its obligation, without mentioning lack of notice).  The Trustee has pointed to no evidence to the contrary, relying instead on an implausible, standalone denial that it never heard about the GM Bankruptcy.  The Court need not conclusively resolve this question now, however, given the other disputed factual issues discussed immediately below.

Third, and most importantly, the Court cannot say that the record definitively demonstrates that the Trustee breached its contractual duty to act like a prudent person during the course of the GM Bankruptcy.[8]  Plaintiffs have certainly submitted evidence that could be used to prove that the Trustee acted imprudently when it chose not to cover all its bases by filing in the GM Bankruptcy—such as the absence of the Trustee's consent to an assignment of the Loan Agreement, the fact that the 1999 Agreement bound Delphi to the Loan Agreement only "to the extent that GM would have been bound" to it, *see* Pl. Br. at 3–4, and the Trustee's alleged failure to provide timely, detailed, and specific notice to bondholders, *see id.* at 5–8, 14–16.  But the Court is not prepared at this point to hold, as a matter of law, that the Trustee did not act prudently under the circumstances.  Based on the preliminary evidentiary record, a reasonable

---

[8] Notably, there is no *express* requirement in the Indenture that the Trustee file a timely proof of claim, which is why Plaintiffs must style their claim as a breach of the contractual duty of prudence.  *See* Compl. ¶ 71.

juror could consider and ultimately credit the evidence supporting the Trustee's position that it acted prudently given the circumstances—such as the fact that Delphi was paying off the Bonds throughout the GM Bankruptcy despite the automatic stay, and the representations made in the Abrams-BNY and Abrams-Delphi Emails.  *See, e.g.*, Def. Rep. at 2–3.[9]

The question of the Trustee's prudence under these specific circumstances is thus a mixed question of fact and law that is not resolvable at this stage and on this record.  *See LNC Invs.*, 1997 WL 528283, at *16 ("[T]o prevail, the trustees must prove that they acted as reasonably prudent people, while plaintiffs must prove that the trustees failed to act as reasonably prudent people.  Both motions [for summary judgment] fail because determinations of reasonableness and prudence are fact-intensive, and in this case there are issues of fact as to whether the trustees acted or failed to act as reasonably prudent people."); *cf. Boeckman v. A.G.*

---

[9] The Court is not persuaded by Plaintiffs' argument that the Trustee is collaterally estopped by the February 2012 Order from arguing that it acted prudently during the course of the GM Bankruptcy.  *See* Plaintiffs' Reply Memorandum of Law (Doc. 52) at 8.  While the Delphi Bankruptcy Court held that the Trustee was still required to file a timely proof of claim *in the Delphi Bankruptcy* regardless of whether Delphi was making payments on the Bonds, the Bankruptcy Court did not purport to—nor did it need to—rule on whether the Trustee complied with its contractual duty of prudence during *the GM Bankruptcy.  See, e.g.*, *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010) (requiring that an issue be actually raised, litigated, and decided in order for collateral estoppel to apply).  The Court also declines Plaintiffs' invitation, Pl. Br. at 17–18, to resolve the genuine issues of fact in this case based solely on *In re Drexel Burnham Lambert Grp. Inc.*, No. 90 B 10421 (FGC), 1992 WL 53742 (Bankr. S.D.N.Y. Mar. 4, 1992).  First, the Indenture is governed by Ohio law, not New York law.  Even then, *Drexel Burnham* is relevant authority, but the circumstances in that case were sufficiently different that the Court will not treat it as dispositive of the Trustee's prudence in this case.  Plaintiffs rely on the *Drexel* court's explanation for why an indenture trustee's late proof of claim was "excusable" under specific circumstances—in that case, the "obligation" to file a proof of claim was triggered by a default event, but the default event occurred *after* the bar date, meaning timely filing was impossible.  *See In re Drexel Burnham*, 1992 WL 53742, at *2–3.  *Drexel Burnham* does not categorically endorse the proposition that a "prudent" indenture trustee is always required to file a timely proof of claim upon default under all circumstances.  *Cf.* Def. Rep. at 12 (arguing that the Indenture "does not require the Trustee to file a proof of claim but only to act prudently").  The *Drexel* court did not have to reach such a broad result to deem the late proof of claim "excusable" in that case, because the default event, *regardless* of whether prudence required the filing of a proof of claim, undisputedly occurred after the bar date.  *See In re Drexel Burnham*, 1992 WL 53742, at *2–3.  The posture and circumstances here are different, in ways that favor both sides on the question of whether the Trustee acted imprudently:  For example, in Plaintiffs' favor, GM's bankruptcy petition itself constituted an Event of Default under the Indenture, meaning the Trustee's contractual duty of prudence was triggered six months before the GM Bar Date, allowing for the filing of a timely proof of claim.  But as already noted, the Bonds were being paid by Delphi during that entire six-month period.  All of which is to say, once again, that whether the Trustee acted prudently is not resolvable on the current, pre-discovery record.

*Edwards, Inc.*, No. 05 Civ. 658 (GPM), 2007 WL 4225740, at \*4 (S.D. Ill. Aug. 31, 2007)

("Typically, whether a fiduciary acted prudently—or in other words, as a reasonably prudent

fiduciary—is a question of fact.") (citations and internal quotation marks omitted); *Dresner Co.*

*Profit Sharing Plan v. First Fid. Bank, N.A., New Jersey*, No. 95 Civ. 1924 (MBM), 1996 WL

694345, at \*7 (S.D.N.Y. Dec. 4, 1996) ("[W]hether the trustees here committed a mere error in

judgment cannot be decided merely on the pleadings.  The issue of prudence, here, presents a

question of fact.").  Indeed, Plaintiffs' counsel noted at the pre-motion conference before this

Court that whether the Trustee acted prudently was an issue that the parties would likely litigate

with battling experts.  *See* Transcript (Doc. 25) at 15–17.  Without a more developed record as to

what indenture trustees typically do under the circumstances and the consequences of different

courses of action, the Court cannot grant summary judgment to Plaintiffs on their first claim at

this time.  *See Becker v. Bank of N.Y. Mellon Trust Co., N.A.*, No. 11 Civ. 6460 (LDD), 2016 WL

1178072, at \*13 (E.D. Pa. Mar. 23, 2016) ("The parties proffer extensive expert opinion

evidence of custom and practice in the corporate trust industry to establish the contractual intent

and meaning of the transaction agreements.  Each side's experts provide opinions that conflict

with those of the other side's experts….[T]he record also establishes triable disputes as to

whether Defendants breached any contractual duties, and whether any proven breach caused the

bondholders to incur loss or damage."); *LNC Invs.*, 1997 WL 528283, at \*17 ("[A]lthough in

some cases prudence will dictate one and only one course, and failure to follow that course will

impose liability, prudence may point also toward more than one course….") (citation omitted).

The Trustee's motion to dismiss the first claim is denied.  Plaintiffs' cross-motion for

summary judgment on the first claim is denied without prejudice, with leave to renew after

discovery.

**B.  Second Claim:  Breach of Contract for Failure To File Timely in Delphi Bankruptcy**

Plaintiffs' second claim alleges breach of contract based on the Trustee's failure to file a timely proof of claim in the Delphi Bankruptcy.  Compl. ¶¶ 75–78.

The Trustee, applying New York's six-year statute of limitations on contract actions, argues that this claim should be dismissed because it accrued on the Delphi Bar Date, July 31, 2006, over six years before Plaintiffs initiated this case.  Def. Br. at 15 (citing N.Y. CPLR § 213(2)); *see also Lehman XS Trust, Series 2006-4N ex rel. U.S. Bank Nat. Ass'n v. Greenpoint Mortg. Funding, Inc.*, 991 F. Supp. 2d 472, 476 (S.D.N.Y. 2014) ("Under New York law, breach of contract claims are subject to a six year statute of limitations.") (citation omitted), *aff'd*, No. 14 Civ. 399, 2016 WL 1039917 (2d Cir. Mar. 16, 2016).

Plaintiffs do not take issue with the applicability of New York's statute of limitations.[10] Instead, Plaintiffs try to restyle the allegations constituting their second claim for relief, arguing that the relevant breach of the Indenture occurred in 2010 when the Trustee demanded indemnification in order to take action "whose sole object," according to Plaintiffs, "was to attempt to mitigate the damages" caused by the Trustee's failure to timely file in the GM Bankruptcy.  Pl. Br. at 18.  This restyling is just an attempt to avoid the statute of limitations, but it is unavailing.  The Complaint is clear that the second claim goes to a breach of the Indenture based on the failure to file timely in the Delphi Bankruptcy, a claim that accrued on July 31,

---

[10] While the Indenture provides that it will be construed in accordance with Ohio law, "'[u]nder New York law, a choice of law clause is construed as choosing only the applicable substantive law,' and statutes of limitations 'are regarded as part of the forum's procedure.'"  *Gilman v. Marsh & McLennan Cos., Inc.*, 868 F. Supp. 2d 118, 136 (S.D.N.Y. 2012) (quoting *Ins. Co. of N. Am. v. ABB Power Generation, Inc.*, 925 F. Supp. 1053, 1059 (S.D.N.Y. 1996)), *aff'd*, No. 15 Civ. 0603, 2016 WL 3391586 (2d Cir. June 16, 2016).  "Parties to a contract may elect to limit claims by a period shorter than that provided in statute, but 'the intention to establish a shorter period must be clearly set forth in the contract.'"  *Id.* (quoting *Hurlbut v. Christiano*, 63 A.D.2d 1116, 1117 (N.Y. App. Div. 1978)); *see also Intercept Pharm., Inc. v. Howard*, No. 14 Civ. 1480 (AKH), 2014 WL 11350971, at *3 (S.D.N.Y. Aug. 4, 2014), *aff'd*, 615 F. App'x 42 (2d Cir. 2015).  The Indenture does not evince any express intent regarding the limitations period, so the Court will apply New York's statute of limitations.

2006.  Plaintiffs are simply trying to set the accrual date at the time at which damages began to

flow from the purported breach, but under New York law a "breach of contract claim accrues at

the time of breach, even if plaintiff does not suffer damages until a later date."  *Lehman XS*

*Trust*, 991 F. Supp. 2d at 476 (citing *Ely–Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985,

986–87 (N.Y. 1993)).

Plaintiffs' second claim is time-barred and is therefore dismissed with prejudice.

### C.  Fourth Claim:  Breach of Fiduciary Duty for Insisting on Indemnification Before Attempting To Collect from GM

Plaintiffs' fourth claim asserts that the Trustee breached its fiduciary duty by failing "to

take all reasonable actions at its own expense" to cure its own "gross negligence" in failing to

timely file in the GM Bankruptcy, including its failure to file a late proof of claim in the GM

Bankruptcy and its request for indemnification in the May 2013 letter.  Compl. ¶¶ 85–89.  In

essence, Plaintiffs argue that, where the Trustee's "gross negligence" prevented bondholders

from collecting on the Bonds, the Trustee's inaction and insistence on further indemnification in

order to rectify that gross negligence was a breach of the Trustee's fiduciary duties.  Pl. Br. at

19–20 ("Because the Trustee was obliged to pay for the costs of cleaning up the mess created by

its failure to file a proof of claim, it had no right to demand indemnification from Plaintiffs.").

The parties do not expressly discuss choice of law with respect to this claim.  Plaintiffs

appear to rely on New York law.  *Cf.* Pl. Br. at 19–20, 23.  The Trustee does not make any

specific objection and does not cite to any fiduciary-duty case law, but it does rely on New York

law when discussing punitive damages.  *See* Def. Rep. at 24.  Accordingly, the Court will apply

New York law to Plaintiffs' fourth claim of relief.  *See Fed. Ins. Co. v. Am. Home Assur. Co.*,

639 F.3d 557, 566–67 (2d Cir. 2011) ("[W]here the parties agree that New York law controls,

this is sufficient to establish choice of law.") (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d

133, 138 (2d Cir. 2000)); *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)

("The parties' briefs assume that New York substantive law governs the issues…, and such

implied consent is, of course, sufficient to establish the applicable choice of law.") (citation

omitted).[11]

　　"In New York, an indenture trustee owes to bondholders limited extra-contractual duties

that expand after the occurrence of an event of default." *Ellington Credit Fund, Ltd. v. Select*

*Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011).  "Prior to an event of

default, an indenture trustee's duty is governed solely by the terms of the indenture, with two

exceptions:  a trustee must (1) avoid conflicts of interest, and (2) perform all basic, non-

---

[11] This implicit agreement avoids the potentially complex question of whether Plaintiffs' fiduciary-duty claim arises from the Indenture (thus requiring application of Ohio law) or instead whether it sounds in tort (thus potentially requiring application of Florida law, where Plaintiffs reside). *Compare Grund v. Del. Charter Guar. & Trust Co.*, 788 F. Supp. 2d 226, 243–44 (S.D.N.Y. 2011) (concluding that New York's choice-of-law rule for torts required law of investor's residence to apply to fiduciary-duty claim against trustee), *on reconsideration*, No. 09 Civ. 8025, 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011), *and Koury v. Xcellence, Inc.*, 649 F. Supp. 2d 127, 135 (S.D.N.Y. 2009) ("In New York, claims for breach of fiduciary duty are analyzed under choice of law principles applicable to torts.") (citation and internal quotation marks omitted), *with Broederdorf v. Bacheler*, No. 15 Civ. 2117 (SRD), 2015 WL 5334265, at *5 (E.D. Pa. Sept. 14, 2015) (applying state law specified in contract's choice-of-law provision where alleged fiduciary duty arose from contract), *and Globalnet Financial.Com, Inc. v. Frank Crystal & Co.*, No. 03 Civ. 0733 (RWS), 2004 WL 1632594, at *4 (S.D.N.Y. July 22, 2004) ("Globalnet's causes of action for breach of contract and for breach of fiduciary duty are contractual in nature, and are therefore subject to the grouping of contacts choice of law analysis."), *aff'd*, 449 F.3d 377 (2d Cir. 2006), *and Raymond James & Assocs. v. Bank of N.Y. Trust Co.*, No. 07 Civ. 239T27 (TBM), 2008 WL 4279629, at *3–6 & n.5 (M.D. Fla. Sept. 18, 2008) (applying state law specified in indenture's choice-of-law provision to certificate holder's breach of fiduciary claim against indenture trustee).  Furthermore, New York law is appropriate where neither side has cited to any Ohio or Florida law on the post-default fiduciary duties of indenture trustees, let alone conflicting law, and the Court has similarly not found relevant authority.  *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 n.2 (2d Cir. 2013) ("[C]ourts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs.") (citing *Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n.4 (2d Cir. 1981)); *cf. In re Nat'l Century Fin. Enterprs., Inc.*, 377 F. App'x 531, 539–40 (6th Cir. 2010) (holding that indenture trustee did not owe fiduciary duty to healthcare provider under Ohio law where provider was not in privity with trustee via indenture agreement or any other agreement).  It is further worth noting that such a conflict is unlikely given other jurisdictions' embrace of New York common law with respect to the duties of indenture trustees.  *See Galena St. Fund, L.P. v. Wells Fargo Bank, N.A.*, No. 12 Civ. 00587 (BNB), 2013 WL 2114372, at *12–13 (D. Colo. May 15, 2013) (adopting New York law on duties of commercial trustee in absence of Colorado law on point); *Harriet & Henderson Yarns, Inc. v. Castle*, 75 F. Supp. 2d 818, 830 (W.D. Tenn. 1999) ("This case does not deal with the duty of an ordinary trustee, but with the obligations of an indenture trustee.  In arguing over the scope of those duties, the parties look primarily to caselaw from the state of New York, out of which most of the important cases on this topic have issued."); *In re Lower Bucks Hosp.*, 471 B.R. 419, 444 n.33 (Bankr. E.D. Pa. 2012) ("Most of the case law on the subject of the duties of indenture trustees applies New York law."), *aff'd*, 488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014); *cf. In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1308–09 (11th Cir. 2006) (citing approvingly, in dicta, Second Circuit cases applying New York law on indenture trustee's pre-default duties).

discretionary, ministerial tasks with due care." *Id.* (citations omitted).  But following an event of

default, "[b]reach of fiduciary duty claims may be brought for acts that are outside the scope of

contractual duties." *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, No. 14 Civ. 10103

(JGK), 2016 WL 1212573, at *14 (S.D.N.Y. Mar. 28, 2016) (citing cases).  Specifically,

"following an Event of Default, a trustee takes on a special duty to secure the assets of the trust

and act with undivided loyalty to trust beneficiaries." *Blackrock Core Bond Portfolio v. U.S.*

*Bank Nat'l Ass'n*, No. 14 Civ. 9401 (KBF), 2016 WL 796848, at *20 (S.D.N.Y. Feb. 26, 2016)

(citing *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 13 (N.Y. App. Div. 1995)); *see also*

*Ellington Credit Fund*, 837 F. Supp. 2d at 192 ("Following an event of default, however, an

indenture trustee's duties to noteholders come more closely to resemble those of an ordinary

fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture.")

(citations and internal quotation marks omitted).

Plaintiffs' theory here is that the Trustee, following the GM Bankruptcy and Delphi's

refusal to keep paying under the Bonds (both Events of Default), breached its fiduciary duties by

insisting on indemnification before taking further action following the February 2012 Order and

Joint Stipulation.  These allegations properly plead a post-Event-of-Default breach of fiduciary

duty and are not amenable to dismissal at this stage.  *Cf. Becker*, 2016 WL 1178072, at *10 (in

bondholder suit alleging breach of fiduciary duty by indenture trustee for failure to perfect bond

security following bond-debtor's bankruptcy petition, finding triable issues as to scope of

trustee's duties, custom in corporate trust industry, breach, causation, and damages); *Royal Park*

*Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 609 (S.D.N.Y. 2015) ("[A]fter

an Event of Default, an indenture trustee takes on a special fiduciary duty to exercise its powers

in order to secure the trust.  Thus, insofar as plaintiffs allege a post-Event of Default breach of fiduciary duty, they properly state a claim….") (citing *Beck*, 218 A.D.2d at 13).[12]

The Trustee argues that sections 9.1(*l*) and 9.1(o) of the Indenture bar Plaintiffs' fiduciary duty claim because those provisions provide that the Trustee is not under an obligation to put its own funds at risk or to take any action without indemnity.  Def. Rep. at 22.  But the mere fact that the governing indenture does not prohibit the conduct challenged here does not *per se* defeat a post-Event of Default fiduciary duty claim.  "After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law, such that fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries, and the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture."  *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) (citing *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 935 F. Supp. 1333, 1347–48 (S.D.N.Y. 1996); *Beck*, 218 A.D.2d at 11–12) (internal quotation marks omitted); *see also Royal Park Invs.*, 109 F. Supp. 3d at 609 n.127 (noting that the post-Event of Default fiduciary duty was "independently created by New York courts for fear that 'broad exculpatory provisions' would excuse indenture trustees from operating in the best interest of the certificateholders") (quoting *Beck*, 218 A.D.2d at 12).  Additionally, while section 9.1(*l*) allows the Trustee to require "a satisfactory indemnity bond…to protect it against all liability," such a request may *not* be made to protect against liability that is "adjudicated to have resulted from [the Trustee's] failure to comply with the

---

[12] Candidly, however, the Court is compelled to point out that neither party has cited authority that is directly on point—cases in which an indenture trustee was alleged to have breached its post-default fiduciary duty by insisting on further indemnification in order to mitigate damages caused by its own mistake.

standard of care prescribed in Section 9.1(a)," *i.e.*, the Trustee's duty to use the same degree of care and skill as a prudent person following an Event of Default.

The Trustee also argues that its inaction with respect to GM could not have been a breach of its fiduciary duty because Plaintiffs instructed the Trustee to take the position that Delphi was the direct obligor of the Bonds.  Def. Rep. at 22–23.  To the extent this argument relies on judicial estoppel, the Court rejects it for the same reason discussed above—though once again, Plaintiffs' prior positions may be evidence relevant to the question of whether the Trustee breached its fiduciary duties or not.   And to the extent this argument is, in so many words, invoking a type of waiver, ratification, or acquiescence defense, the possibility that a more developed factual record may sustain such defense does not defeat the plausibility of the allegations taken as true at the motion-to-dismiss stage.

The Trustee next contends that the indemnification provision of the D&I Agreement bars Plaintiffs' fiduciary duty claim.  *See* Def. Br. at 19–20.  This argument too is unavailing.  By its express terms, the D&I Agreement does not indemnify losses caused by the Trustee's "gross negligence or willful conduct," and the Court will not interpret the document to insulate the Trustee from its own negligence without a more explicit statement of intent.  *See Eckhoff*, 2013 WL 6847117, at *3 (S.D.N.Y. Dec. 30, 2013); *BNP Paribas Mortg.*, 778 F. Supp. 2d at 415; *Williams*, 248 F.Supp.2d at 325–26; *cf. Becker*, 2016 WL 1178072, at *19 ("The agreements in this case in no way express in unequivocal terms any intent or purpose on the part of the bondholders to indemnify the Indenture Trustee for loss resulting from its negligence or misconduct.  Instead, the Indenture clearly and unequivocally states that the Indenture Trustee can be held liable for 'its own wilful misconduct or negligence.'") (citation omitted).  The D&I Agreement, therefore, does not automatically bar Plaintiffs' fourth claim to the extent it alleges

that the Trustee negligently or willfully breached its fiduciary duty by not voluntarily pursuing a late claim against GM at its own expense and without further indemnity.  Moreover, it is at least plausible based on the allegations that the Joint Stipulation constituted the conclusion of the Trustee's compliance with the Instruction, such that the Trustee's purportedly actionable conduct that post-dated execution of the Stipulation would not be covered by a provision indemnifying for losses caused by enforcement of the Instruction.

Finally, the Court notes that, because this is a fiduciary-duty claim for money damages, not equitable relief, the applicable statute-of-limitations is three-years.  *See, e.g.*, *Ciccone v. Hersh*, 320 F. App'x 48, 50 (2d Cir. 2009) ("The statute of limitations for a breach of fiduciary duty action seeking monetary damages is three years.") (citing *Bouley v. Bouley*, 19 A.D.3d 1049, 1051 (N.Y. App. Div. 2005); *Phoenix Light SF*, 2016 WL 1212573, at *4 n.2 (same) (citing *IDT Corp. v. Morgan Stanley*, 907 N.E.2d 268, 272–73 (N.Y. 2009)).  Thus, Plaintiffs can only collect damages caused by breaches that occurred after November 30, 2012.  The Court further notes that, as with the surviving breach of contract claim, Plaintiffs can only seek to recover damages that were proximately caused by the Trustee's breaches.  *See LNC Invs., Inc. v. First Fidelity Bank*, 173 F.3d 454, 464–66 (2d Cir. 1999) (requiring bondholders to prove that indenture trustee's imprudence was proximate cause of all recoverable damages).

The Trustee's motion to dismiss the fourth claim for relief is denied.

### D.  Punitive Damages

Plaintiffs seek punitive damages on all claims, arguing that such damages are warranted because of the Trustee's "routine practice" of seeking indemnification for efforts required to rectify the Trustee's own negligent and actionable conduct.  Compl. ¶¶ 90–94.

30

Both parties assume New York law controls the punitive-damages issue for all claims.
*See* Pl. Br. at 22–23; Def. Rep. at 24.  That is likely not the case with respect to the first claim for
breach of the Indenture, since the Indenture requires application of Ohio law.  And under Ohio
law, punitive damages are not available for breach of contract claims.  *See, e.g.*, *Koehler v.
PepsiAmericas, Inc.*, 268 F. App'x 396, 407 (6th Cir. 2008) (explaining that "under Ohio law,
courts generally do not award punitive damages upon findings of breach of contract," except
where there also exists independent tortious conduct involving "fraud, malice, or oppression")
(citations omitted); *Atsco Holdings Corp. v. Air Tool Serv. Co*, No. 15 Civ. 1586 (CAB), 2016
WL 3078902, at *1–2 (N.D. Ohio June 1, 2016) (same).  But even if New York law applied to
the contract claim, Plaintiffs have failed to adequately allege a basis for punitive damages.
Under New York law, in order "to state a claim for punitive damages for a claim that is not itself
an independent tort, such as breach of contract," a plaintiff must allege "egregious" conduct that
is "actionable as an independent tort," "directed to the plaintiff," and "part of a pattern directed at
the public generally."  *Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 250 (E.D.N.Y. 2014) (citations
and internal quotation marks omitted).  Plaintiffs' allegations do not meet these requirements for
three reasons:  (1) There is no allegation that the failure to file a timely proof of claim in the GM
Bankruptcy breached any independent duty in tort distinct from the *contractual* duty of
prudence, (2) the Trustee's alleged explanation for this failure, *i.e.*, Delphi's continuing
payments and GM's denial of its obligation, *see* Bainton Decl., Ex. C at 26, does not rise to the
level of egregious conduct required to sustain a punitive damages claim, and (3) there is no
allegation that the failure to file timely bankruptcy claims constitutes a pattern of conduct
directed at the public, as the allegations speak only to the Trustee's subsequent failure to request

indemnification for past wrongs, *see* Compl. ¶¶ 90–93.  The Trustee's motion to dismiss the request for an award of punitive damages is thus granted as to the first claim for relief.

As to the fourth claim, New York makes available punitive damages with respect to breach of fiduciary duty claims.  *See, e.g.*, *Kaplin v. Buendia*, No. 15 Civ. 649 (PAC), 2015 WL 7460025, at *3 (S.D.N.Y. Nov. 24, 2015) ("'New York law recognizes breach of fiduciary duty as an exception to the general rule that punitive damages are not recoverable for breach of contract claims.'") (quoting *Kubin v. Miller*, 801 F. Supp. 1101, 1122 (S.D.N.Y. 1992)).  "In New York, the standard for conduct warranting an award of punitive damages 'has been variously described but, essentially, it is conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 127 (2d Cir. 2013) (quoting *Home Ins. Co. v. Am. Home Prods. Corp.*, 550 N.E.2d 930, 934–35 (N.Y. 1990)).  "Such conduct need not be intentionally harmful but may consist of actions which constitute wilful or wanton negligence or recklessness." *Id.* (citation and internal quotation marks omitted).  "A punitive damages award cannot be sustained under New York law unless the very high threshold of moral culpability is satisfied, because punitive damages are a social exemplary remedy, not a private compensatory remedy." *Id.* at 128 (citations and internal quotation marks omitted).  "To analyze the egregiousness of a tortfeasor's conduct, and the corresponding need for deterrence, courts must take into account the importance of the underlying right or public policy jeopardized by the tortfeasor's conduct." *Id.* (citation and internal quotation marks omitted).

The gravamen of Plaintiffs' punitive damages claim is as follows:  When it became clear that bondholders would not collect anything of real value from the Delphi Bankruptcy, the

Trustee knew or should have known that its own previous failures to give timely notice and file a timely proof of claim were the cause of this failure—*and yet*, the Trustee refused to take any further action to collects on the Bonds without further indemnification from the very bondholders it had harmed by acting imprudently.  *See* Compl. ¶¶ 53–68, 90–94; Pl. Br. at 21–23.  Far from extraordinary, Plaintiffs allege that the Trustee regularly engages in this "routine practice of willfully seeking 'indemnification' for its costs of attempting to remedy damages proximately caused solely by its own breaches…and sheer incompetence."  Compl. ¶ 90.  Such a "routine practice," Plaintiffs allege, represent a "public wrong" requiring deterrence through imposition of punitive damages.  *Id.* ¶¶ 90, 94.

In the Trustee's view, Plaintiffs cannot possibly prove that the Trustee acted maliciously, wantonly, or recklessly because (i) the Indenture does not require the Trustee to take any action without requesting reasonable indemnification and "Plaintiffs have alleged nothing to show that this provision has been breached or improperly implemented in this case," (ii) Plaintiffs had already instructed the Trustee to take the opposite position, and (iii) GM was not recognizing any obligation under the Bonds.  *See* Def. Rep. at 23–24.

The Court cannot resolve this issue on a motion to dismiss without a developed factual record.  Taking all the allegations in the Complaint as true, it is at least plausible that the Trustee acted sufficiently recklessly or maliciously when it asked Plaintiffs to cover the costs of rectifying the Trustee's own mistakes, all while knowing such a request was in breach of its fiduciary obligations, and as part of a routine practice of making such requests to its bondholder-trust beneficiaries.  *See In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 135, 148 (Bankr. D. Del. 2007) ("Because the Court must closely examine the facts to determine whether the Indenture Trustees engaged in outrageous conduct or acted with an evil motive or with reckless indifference, the

Court concludes that such an inquiry is inappropriate for determination on a motion to dismiss."); *see also Becker*, 2016 WL 1178072, at *20; *Kaplin*, 2015 WL 7460025, at *3 (dismissing motion to dismiss punitive damages request for claim of breach of fiduciary duty); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 423 (S.D.N.Y. 2003) ("It may be that once all the facts are fleshed out there is no sustainable claim for punitive damages. For now the wrongful conduct of Merrill Lynch coupled with its alleged breach of fiduciary duty and its public persona leads me to deny this branch of the motion."); *Kubin*, 801 F. Supp. at 1122 ("Accordingly, as Kubin has alleged a colorable breach of fiduciary duty claim, defendants' motion to dismiss Kubin's claim for punitive damages arising out of the alleged breach of fiduciary duty is denied."). The Trustee's motion is denied as to the fourth claim.

## IV. CONCLUSION

Both Plaintiffs' motion for summary judgment and the Trustee's motion to dismiss are DENIED with respect the first claim for relief. Plaintiffs may seek leave to renew their summary judgment motion after the conclusion of discovery. The Trustee's motion to dismiss is GRANTED as to the second claim for relief, and DENIED as to the fourth claim for relief. Plaintiffs may pursue an award of punitive damages on the fourth claim only.

The Trustee's Answer is now due on **August 19, 2016**. By that same date, the parties are further directed to submit a joint case management plan to the Court. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 22, 37, and 49.

It is SO ORDERED.

Dated:   July 28, 2016
         New York, New York

Edgardo Ramos, U.S.D.J.

34